GORDON SILVER
GERALD M. GORDON, ESQ.
Nevada Bar No. 229
E-mail: ggordon@gordonsilver.com
TALITHA GRAY KOZLOWSKI, ESQ.
Nevada Bar No. 9040
E-mail: tgray@gordonsilver.com
CANDACE C. CLARK, ESQ.
Nevada Bar No. 11539
E-mail: cclark@gordonsilver.com
3960 Howard Hughes Pkwy., 9th Floor
Las Vegas, Nevada 89169
Telephone (702) 796-5555
Facsimile (702) 369-2666
[Proposed] Attorneys for Debtor

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF NEVADA

In re:

NIGRO HQ LLC,

Debtor.

Case No.: 11-21014-MKN
Chapter 11

Date: OST Pending
Time: OST Pending

**OMNIBUS DECLARATION OF TODD NIGRO IN SUPPORT OF DEBTOR'S FIRST DAY MOTIONS**

I, Todd Nigro, hereby declare as follows:

1. I am over the age of 18 and am mentally competent and I make this declaration in support of Debtor's *Emergency Motion for Entry of an Interim Order Pursuant to Bankruptcy Rule 4001(b) and LR 4001(b): (1) Preliminarily Determining Extent of Cash Collateral and Authorizing Interim Use of Cash Collateral by Debtor; and (2) Scheduling a Final Hearing to Determine Extent of Cash Collateral and Authorizing Use of Cash Collateral by Debtor* (the "Cash Collateral Motion") and the *Emergency Motion Pursuant to 11 U.S.C. §§ 105(a) and 366 for an Order Determining that Adequate Assurance Has Been Provided to the Utility Companies* (the "Utility Motion," and together with the Cash Collateral Motion, the "Motions").[1]

---

[1] All capitalized, undefined terms shall have the meaning ascribed to them in the applicable Motion.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102508-003/1261559_2.doc

2.   Except as otherwise indicated, all of the facts set forth in this Declaration are based upon my personal knowledge of Debtor's operations and finances, information learned from my review of relevant documents and information supplied to me by other members of Debtor's management and Debtor's business and legal advisors. If called upon to testify as to the content of this Declaration, I could and would do so.

3.   Attached hereto as **Exhibit "1"** is a summary of projected income and expenses for the three-months following the Petition Date (the "Budget"), which Budget concludes on September 30, 2011.

A.   **Debtor's Operations.**

4.   Debtor is a Nevada limited liability company owned by: (i) the 1990 Nigro Trust; (ii) Nigro Development, LLC; (iii) Sierra Nevada Financial Group, LLC; (iv) Kathleen and Scott MacDougal; (v) David Coons; (vi) Wanda Jacobs Family Trust; and (vii) Charles Hansen, and is managed by Nigro Development, LLC.

5.   Debtor owns and operates a two-story, multi-tenant professional office building located near the intersection of Russell Road and the I-215, more specifically described as 9115 W. Russell Road, Las Vegas, Nevada 89146, APN 163-32-111-006 (the "Property"). The Property is 2.02 acres and the office building consists of 24,713 sq. ft.

6.   The office building, comprised of three suites, is fully leased. The first floor tenants are the Bank of George and Infinity Plus, LLC, and the second floor is leased by Nigro Construction Inc. Each of these leases (the "Leases") is for a 5-year term, which terms conclude on September 30, 2012 and October 31, 2012.

B.   **Debtor's Loan Obligation.**

7.   A Term Loan Agreement was entered into between Debtor and Wachovia effective as of May 16, 2008, pursuant to which Wachovia agreed to lend Debtor the principal amount of $5.1 Million. A true and correct copy of Term Loan Agreement is attached hereto as **Exhibit "2."**

. . .

. . .

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102508-003/1261559_2.doc

2

8.  Consistent therewith, Debtor executed the Promissory Note in favor of Wachovia, in the principal sum of $5.1 Million. A true and correct copy of the Promissory Note is attached hereto as **Exhibit "3."**

9.  As security for the repayment of the Promissory Note, Debtor and Wachovia entered into the Deed of Trust with Assignment of Rents, Security Agreement and Fixture Filing, a true and correct copy of which is attached hereto as **Exhibit "4."** Wachovia also filed a UCC-1 Financing Statement with the Nevada Secretary of State.

10. Debtor also granted Wachovia an Assignment of Permits, Licenses and Approvals, a true and correct copy of which is attached hereto as **Exhibit "5."**

11. As further security for the Loan, I, along with, Ryanne Nigro, Michael Nigro, and Margaret Nigro guaranteed the repayment of the Loan, the maximum liability of which was subsequently limited to $2.25 Million.

12. On August 19, 2008, Debtor and Wachovia entered into a swap agreement. True and correct copies of the Master Agreement, Schedule to the Master Agreement, and Amended and Restated Swap Transaction Confirmation are attached hereto as **Exhibits "6" and "7,"** respectively.

13. The swap agreement was terminated pre-petition.

14. On the May 16, 2011 Maturity Date, the outstanding obligation on the Promissory Note was approximately $4.997 Million.

15. Debtor believes that the value of the Property exceeds the Secured Debt as of the Petition Date.[2]

C.  **The Events Necessitating The Bankruptcy Filing.**

16. Despite having received all monthly payment obligations, on May 18, 2010, one year prior to the Maturity Date, Wells issued to Debtor and the Guarantors notices of default

---

[2] On or about November 17, 2010, the Anderson Valuation Group, LLC prepared an appraisal for Wells, which valued the Property at $4.785 Million. Additionally, on May 18, 2010, Wells advised Debtor that it had obtained an appraisal valuing the Property at $4.925 Million. Although Debtor disputes that such appraisals provide an accurate valuation as of their respective appraisal dates, or as of the Petition Date, it provides a floor as to valuation, thereby supporting Debtor's contention that the value of the Collateral exceeds the Secured Debt.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102508-003/1261559_2.doc

3

premised solely on an alleged loan-to-value ratio covenant default. Specifically, Wells alleged that the value of the Property was $4.925 Million and therefore, purportedly in order to comply with the covenant requiring a loan-to-value ratio of less than 75%, demanded that Debtor immediately tender a payment of $1,352,571 in order to reduce the Loan balance to $3,693,700. Debtor was not able to satisfy the demand.

17. Able to fully service its monthly payment obligations under the Promissory Note and Debtor's belief that the Property was fully secured, prior to the Maturity Date, Debtor contacted Wells and sought to reach a consensual resolution with Wells to extend the term of the Loan; no principal reduction or interest rate relief was requested and the Guarantors agreed to affirm their guarantees in the event of a maturity extension.

18. Despite months of negotiations and Debtor's ability to service its monthly debt obligations, Wells refused to reach a consensual resolution with Debtor unless a consensual resolution was also reached with regard to separate loan obligations with Wells to which Debtor was not a party.

19. As a global resolution could not be reached, on July 7, 2011, Secured Lender recorded its Notice of Trustee's Sale and advised Debtor that it would be filing a complaint and seeking the appointment of a receiver the following week, thereby leaving Debtor with no other option but to seek Chapter 11 relief despite its ability to service its monthly debt obligations under the Promissory Note.

D. **Debtor's Financial Condition.**

20. Debtor's revenue is derived primarily from its Leases. For the period of January through May 2011, Debtor's income exceeded its expenses by nearly $12,000, after payment of approximately $141,000 in principal and interest payments to Secured Lender.

21. Further, for the fiscal year ending December 31, 2011, Debtor anticipates that its revenue will exceed its operating and capital expenses by approximately $384,000.[3]

. . .

---

[3] This is before the principal and interest payments of approximately $141,000 tendered to Wells to date and the proposed adequate protection payments of $90,000 through the end of the year.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102508-003/1261559_2.doc

4

E.  **The Cash Collateral Motion.**

22. On the Petition Date, Debtor had cash and cash equivalents located on the Property as of the Petition Date (the "Cash on Hand") and cash in its bank account as of the Petition Date (the "Deposit Accounts") in the approximate aggregate sum of $845. Such cash was not in the possession of or under the control of Secured Lender.

23. Debtor cannot meet its ongoing post-position obligations unless it has the immediate ability to use Cash on Hand, the Deposit Accounts, and the cash generated or received by Debtor from and after the Petition Date (the "Post-Petition Cash"). In the absence of such use, immediate and irreparable harm will result to Debtor, its estate, and its creditors, and will render an effective and orderly reorganization of Debtor's business impossible.

24. An integral aspect of maintaining Debtor's business operations is Debtor's ability to use Cash on Hand, the Deposit Accounts, and Post-Petition Cash to maintain a sufficient level of working capital in order to pay ordinary course obligations such as those to its vendors, utilities, taxing authorities, insurance, and to pay for necessary ordinary course property maintenance and projects.

25. As exemplified by the Budget, Debtor is solely seeking to utilize the Cash Collateral to maintain the Property in optimal condition, to satisfy its obligations under the Leases, and to pay administrative expenses. Each expense included within the Budget is a necessary expense to maintain, preserve, and/or operate the Property, which is the sole means of generating revenue, thereby increasing the value of the Property and providing the resources for Debtor to reorganize.

26. Debtor believes that the value of the Collateral is more than the Secured Debt as of the Petition Date and that given all of the circumstances regarding the Collateral, the Collateral will not diminish in value.

F.  **The Utility Motion.**

27. In the ordinary course of its business, Debtor incurs utility expenses for telecommunications, electricity, sewer, water, and waste collection. These utility services are provided by the utilities (as such term is used in Section 366, collectively, the "Utility

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102508-003/1261559_2.doc

5

Providers") including, but not limited to, those listed on the Utility Service List attached as **Exhibit "2"** to the Utilities Motion.

28.  On average, Debtor spends approximately $1,248.59 each month on utility costs.[4] As of the Petition Date, Debtor believes it is substantially current on utility payments as set forth in the Utility Service List that came due on or before the Petition Date.

29.  Preserving utility services on an uninterrupted basis is essential to Debtor's ongoing operations and, therefore, to the success of its reorganization. Any interruption of utility services, even for a brief period of time, would disrupt Debtor's ability to continue servicing its customers, thereby negatively affecting customer relationships, revenues, and profits. Such a result could jeopardize Debtor's reorganizations efforts and, ultimately, Debtor's value and creditor recoveries. It is therefore critical that utility services continue uninterrupted during this Chapter 11 Case.

30.  Debtor intends to pay postpetition obligations owed to the Utility Providers in a timely manner. Debtor expects that it will have ample liquidity, based upon cash on hand and cash flow from operations, to pay its postpetition obligations to its Utility Providers. Specifically, Debtor's operations are currently cash flow positive prior to debt service, and Debtor presently has approximately $845 either in cash on hand or in its bank accounts as of the Petition Date.

31.  To provide additional assurance of payment for future services to the Utility Providers, Debtor has allocated the collective sum of $1,250.00 (representing more than one month's average utility expense) to be made available from Debtor's cash flow for the first two weeks for payment of utility deposits (the "Utility Deposit Reserve"). The Utility Deposit Reserve will provide still further assurance of future payment, over and above the Debtor's ability to pay for future utility services in the ordinary course of business based upon their existing cash on hand and cash flow from operations (collectively, with the Utility Deposit Reserve, the "Proposed Adequate Assurance"). Debtor submits that the Proposed Adequate

---

[4] To calculate the approximate monthly expenditure for utility costs, Debtor determined the average costs based on actual costs over twelve-month period.

Gordon Silver
Attorneys At Law
Ninth Floor
3960 Howard Hughes Pkwy
Las Vegas, Nevada 89169
(702) 796-5555

102508-003/1261559_2.doc

6

Assurance provides protection well in excess of that required to grant sufficient adequate assurance to the Utility Providers.

I declare under penalty of perjury of the laws of the United States that these facts are true to the best of my knowledge and belief.

DATED this 13th day of July, 2011.

TODD NIGRO